IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SELENA BOSTON, *et al.*,<br><br>     Plaintiffs,<br><br>v.<br><br>MICAH SIERRA KATT WILLIAMS, *et al.*,<br><br>     Defendants. | CIVIL ACTION<br>NO. 1:23-cv-00752-WMR |

## ORDER

On September 8, 2025, the Court entered an Order directing Plaintiffs' counsel, Loletha Hale, to appear before the Court for a scheduled evidentiary hearing to show cause why she should not be sanctioned for violating Rule 11(b)(2). [*See* Doc. 62]. In response, Plaintiffs have filed a Motion to Recuse pursuant to 28 U.S.C. § 455(a) seeking to disqualify the undersigned from further presiding over this matter. [Doc. 64]. For the reasons explained below, Plaintiffs' motion is DENIED.

Pursuant to 28 U.S.C. § 455(a), a district court judge must disqualify himself from any case or proceeding in which his impartiality might reasonably be questioned. A judge must also disqualify himself where: (i) he has a personal bias or prejudice concerning a party or has personal knowledge of disputed evidentiary facts concerning the proceeding; (ii) he is a party or he has served as a lawyer or witness

1

in the matter in controversy; or (iii) he has a financial or other substantial interest in the subject matter of the proceeding or in a party to the proceeding. *See* 28 U.S.C. § 455(b)(1)–(5).

In their motion, Plaintiffs do not assert that the undersigned has any personal bias against the parties or that the undersigned has any conflict which would prevent the undersigned from presiding over the parties or the subject matter of this case. Rather, Plaintiffs contend that the undersigned's impartiality in this case might reasonably be questioned because the undersigned spoke to their counsel, Ms. Hale, "in a disrespectful and condescending manner, and questioned her honesty, candor and credibility in open court" during a hearing on Defendants' motion for summary judgment. [Doc. 64 at 2; Doc. 64-1 at ¶ 3]. Plaintiffs also take issue with the undersigned's discussion concerning the merits of Defendants' motion for summary judgment and the fact that, at the conclusion of the summary judgment hearing, the undersigned asked Defendants' counsel to submit a proposed order. [Doc. 64 at 2, 6; Doc. 64-1 at ¶ 3]. As will be discussed below, none of Plaintiffs' contentions warrant recusal (or disqualification) under § 455(a).[1]

---

[1] The Court finds that the undersigned is authorized to rule on the merits of Plaintiffs' motion to recuse, rather than having another judge assigned to hear the motion, because Plaintiffs have failed to comply with the provisions of 28 U.S.C. § 144. Specifically, Plaintiffs' supporting affidavit was not accompanied by a certificate of counsel stating that it was made "in good faith." The Court notes that it is now too late to file such certificate of counsel, as the code section provides that only one such affidavit may be filed in any case.

2

The background facts are as follows.  When reviewing Plaintiffs' response brief prior to the hearing on Defendants' motion for summary judgment, the undersigned discovered that most of the cases cited by Ms. Hale as legal authority either did not exist, did not support the proposition for which they were cited, or misquoted the authority. The glaring inaccuracies of the brief prepared by Ms. Hale prompted the undersigned to recall a prior unrelated case in which Ms. Hale had made blatant misrepresentations before this Court.[2]  Based on the foregoing, the undersigned had grave concerns about Ms. Hale's level of professionalism and the quality of legal representation she is providing to Plaintiffs in this case.

Accordingly, at the hearing on the motion for summary judgment, the undersigned confronted Ms. Hale about the citation-related deficiencies in her brief, as well as her professionalism.  Although she indicated that she had mistakenly filed an incorrect version of the brief drafted by her daughter (who is not an attorney or paralegal), she conceded that she failed to review the brief before it was filed. Because it appeared that Ms. Hale abdicated her responsibility to ensure that the brief she signed and filed with the Court was accurate, the Court scheduled a show cause hearing for the purposes of determining whether Rule 11 sanctions against Ms.

---

[2] In *Lewis v. Aimbridge Hospitality, LLC*, No. 1:18-cv-05917-WMR, Ms. Hale misrepresented facts to a jury when testifying under oath as a witness before this Court. A transcript excerpt containing Ms. Hale's untruthful testimony (and the Court's admonishment) is attached hereto as an exhibit. [*See* transcript excerpt at pp. 7–14].

3

Hale are appropriate. Faced with the possibility of sanctions for filing her flawed brief, Ms. Hale (on behalf of Plaintiffs) filed the present motion to recuse (or disqualify) the undersigned from presiding over the matter.

As an initial matter, the fact that the undersigned may have questions regarding the honesty, candor, and credibility of Ms. Hale's explanation for her flawed brief is not a proper basis for disqualification. Indeed, judges are required to make such determinations when addressing Rule 11 violations.

Furthermore, although the undersigned has concerns about Ms. Hale's professionalism, based not only on her flawed brief but also her prior misrepresentations in an unrelated case before this Court, such concerns are not a proper basis to have a different judge assigned to preside over the matter. To be clear, it is Ms. Hale's conduct in this case that is at issue here. The fact that the undersigned has decided to address Ms. Hale's conduct in no way suggests any bias or prejudice toward Plaintiffs. Rather, it is indicative of the undersigned's concern about the quality of legal representation that Plaintiffs are receiving.

Lastly, Plaintiffs attempt to cast doubt on the undersigned's impartiality based on statements made during the summary judgment hearing is without merit. In their motion for summary judgment, one of the grounds argued by Defendants was that Plaintiffs had failed to timely respond to Defendants' request for admissions ("RFA") and, thus, the matters deemed admitted had established that Defendants

were entitled to judgment as matter of law. In addressing that argument, the undersigned questioned Ms. Hale about why Plaintiffs had not timely responded to the RFA's and why she had not filed a motion on Plaintiffs' behalf to withdraw those admissions. Notably, had Ms. Hale made an oral motion to withdraw the admissions at the hearing, the undersigned would have considered it. But Ms. Hale did not. Therefore, after considering the arguments of both parties, the undersigned requested Defendants' counsel to submit a proposed order.³ This in no way suggests that the undersigned has any bias or prejudice concerning Plaintiffs.

In sum, Plaintiffs have simply failed to show that the undersigned's impartiality might reasonably be questioned in this case. Accordingly, Plaintiffs' Motion to Recuse pursuant to 28 U.S.C. § 455(a) is **DENIED**.

SO ORDERED, this 23rd day of September, 2025.



WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE

---

³ Two days day after the summary judgment hearing, Ms. Hale filed a motion on behalf of Plaintiffs to withdraw the admissions. [*See* Doc. 61].

```
                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
                         ATLanta DIVISION



LOLETHA HALE LEWIS,            )
                               )
          Plaintiff,           )
                               )
     v.                        ) CIVIL ACTION
                               ) FILE NO. 1:18-CV-05917-WMR
AIMBRIDGE HOSPITALITY, LLC et al.,)
                               )
          Defendants.          ) JURY TRIAL
                               )
                                 VOLUME VIII OF IX


                        **EXCERPT**

-----------------------------------------------------------

              BEFORE THE HONORABLE WILLIAM M. RAY, II


                    TRANSCRIPT OF PROCEEDINGS


                       NOVEMBER 4, 2021

-----------------------------------------------------------


          Proceedings recorded by mechanical stenography
           and computer-aided transcript produced by

                 WYNETTE C. BLATHERS, RMR, CRR
                    Official Court Reporter
                     1714 U.S. Courthouse
                   75 Ted Turner Drive, SW
                   Atlanta, Georgia  30303
                       (404) 215-1547
```

```
 1  APPEARANCES:

 2

 3  For the Plaintiff:      JAMES W. HOWARD, ESQ.
                            SHARON E. HOWARD, ESQ.
 4                          The Howard Law Firm
                            Kyleif Center
 5                          1479 Brockett Road, Suite 200
                            Tucker, Georgia   30084
 6
     For the Defendants:    NEAL C. SCOTT, ESQ.
 7                          Law Office of Terry-Dawn Thomas
                            1001 Summit Boulevard, Suite 1750
 8                          Atlanta, Georgia   30319

 9                          MICHAEL T. GOODIN, ESQ.
                            2095 Exeter Road, P.O. Box 351
10                          Germantown, Tennessee   38138

11                          LLOYD E. N. HALL, ESQ.
                            Lloyd E. N. Hall
12                          P.O. Box 81832
                            Atlanta, Georgia   30366
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    Thursday Morning Session
 2                       November 5, 2021
 3                           9:30 a.m.
 4                            -  -  -
 5                      P R O C E E D I N G S
 6                      (Excerpt of Proceedings)
 7  BY MS. HOWARD:
 8  Q    All right.  So there was a question asked about a bench
 9  trial in 2012 and some kind of terroristic threat.  Can you
10  tell us about that.
11  A    Well, I was handling a divorce case in Henry County, and I
12  represented the wife.  And we basically resolved everything
13  sitting outside the courtroom on this particular day and --
14  except for child support.  They could not agree on child
15  support.  He was paying like $200 a month, and she wanted him
16  to pay $500.  And I told them that the judge has to resolve
17  that issue anyway.
18           And so we were walking toward -- back inside the
19  courtroom so I could announce to the judge that, you know,
20  things were resolved except for that particular issue, and the
21  husband -- his wife was on the other side.  I was walking in
22  between them, and he raised his hand up to like -- as though
23  he was going to strike me twice.  And he said, are you scared
24  now, bitch?  And it just -- I didn't know where it came from.
25           So I did later learn that she was taunting him with
```

1   me, using me to threaten him because I never really had any
2   problems out of him.  But, anyway, went inside the courtroom,
3   and I announced to the judge that it had been resolved except
4   for child support, and then I told him that -- what had just
5   taken place immediately prior to our entering the courtroom.
6   And he questioned the husband, questioned him, and he denied
7   he did it.
8           And I felt compelled to tell the judge because this
9   guy had -- he had a history of making terroristic threats
10  against my client.  He had a gun.  He had saw someone in my
11  client's Hummer, and he pulled a gun on that person.  So to
12  say that I wasn't concerned would be an understatement, so I
13  felt compelled to tell the judge what he had done.  And I told
14  the judge that this man has a gun, and he has a history of
15  terroristic threats and about the Hummer incident.  And
16  basically I said I just want to let him know that if he
17  approached me with a gun, I have a gun too and I will use it,
18  or something to that effect.
19          And the judge told him to stay away from me, and he
20  said that there was no point of my contacting him because at
21  that point he was pro se, he was representing himself, and
22  told them that he was going to schedule a hearing about child
23  support or something like that.
24          But subsequent to that hearing, the wife and I went
25  to the police department to file a complaint about him making

```
 1  the threats, him, you know, raising his hand to strike me.
 2  And when we finished speaking with the detective -- I think it
 3  was the McDonough Police Department -- the detective told --
 4  she wrote a statement, and I wrote my statement, a very
 5  detailed statement about what I just talked about.
 6          The detective said, well, he's been over here, and he
 7  wrote a statement too accusing you of making terroristic
 8  threats.  And I asked him to see it, and I saw it and it was
 9  two lines.  It said Attorney Hale made terroristic threats
10  against me outside the courtroom, and Attorney Hale made
11  terroristic threats against me inside the courtroom.
12  Basically that's all it said.  And the detective called the
13  magistrate and asked, I guess, for guidance, and so he just
14  said that they were going to schedule a hearing for it.  And a
15  hearing was scheduled.
16          When I walked in the courtroom -- this is in
17  magistrate court in Henry County -- I saw who the judge was
18  and immediately asked him -- I immediately filed a -- I think
19  I saw his name before that, but I had filed a motion for him
20  to recuse himself because he had a history of -- we had a
21  history, and he refused to recuse himself.  The client had --
22  the client had -- I mean the husband had an attorney who I had
23  seen like maybe four months earlier in a divorce trial with
24  another couple, and he -- I learned later that he was my
25  opposing counsel's partner.
```

1       So this guy basically had volunteered to -- we won
2  the divorce case that took place earlier, about four months
3  earlier, by a landslide.  And this partner, the whole time
4  when I was giving my closing I do -- I didn't know who he was,
5  but he was very distinguished looking, had nice white hair,
6  and he sat there and was just staring at me the whole time I
7  was doing my closing.
8       But, anyway, the second time I saw him was in the
9  magistrate court for the probable cause hearing, and the
10 judge, Jason Harper, was a state court judge who
11 self-appointed himself to preside over that hearing, which he
12 should not have done, and he dismissed my complaint against
13 the husband and said that he felt that I was an imminent
14 threat to the community and upheld -- and found probable cause
15 for the husband's two-line complaint against me.
16      And they had called the local press and everything,
17 so was in the courtroom also in anticipation, I guess, of my
18 arrest.  And when he did that, they took me back to where the
19 inmates, you know, back in the door where the inmates are.
20 And for about -- I guess I was back there maybe about ten
21 minutes, and then he told them to bring me back out and gave
22 me a $1500 signature bond.
23      And so I subsequently had to stand trial on that, and
24 the judge, Judge Wade Crumbley, a former, now retired,
25 superior court judge, he threw it out on a directed verdict.

```
 1  And he called the husband into the courtroom, and he scolded
 2  him.  And he told him that he didn't believe anything he said.
 3  He told him that I had been in his courtroom about four months
 4  prior, that I had a divorce case and I had a very rude and an
 5  abusive opposing counsel and that I maintained my
 6  professionalism and that if he lied again like that to the
 7  Court, that he was going to throw him in jail.
 8            And I ended up filing a complaint against the
 9  magistrate -- I'm not going to call his name -- the magistrate
10  court judge who -- he was a state court judge who appointed
11  himself, self-appointed himself, as a magistrate court judge.
12  And he ended up being forced off the bench for all the things
13  he had done to me leading up to that point, plus himself
14  appointing himself for that probable cause hearing.  So he's
15  no longer a judge.
16  Q    All right.  So the bottom line is that whatever the
17  contempt that was alleged against you, that was thrown out by
18  Judge --
19  A    You're talking about the felony terroristic threat
20  charges?
21  Q    Yes.
22  A    Yes.
23  Q    That was thrown out against you?
24  A    Yes.
25  Q    All right.
```

```
 1            THE COURT:  Before we go on to another item let's
 2   take a ten-minute recess.  We're still going to end at 4:00.
 3   We've been in here a good little while, so we'll take a
 4   ten-minute recess.  Thank you.
 5            COURTROOM SECURITY OFFICER:  All rise.
 6            (Whereupon, the jurors exited the courtroom.)
 7            THE COURT:  What was the name of the Henry County
 8   judge you were just talking about?
 9            THE WITNESS:  Jason Harper.
10            THE COURT:  Jason Harper?
11            THE WITNESS:  Yes.
12            THE COURT:  And he was -- was he removed by the JQC
13   or --
14            THE WITNESS:  Ms. Elaine -- I think her name is
15   Elaine, her first name was Elaine, the investigator -- went to
16   talk with him, and instead of him being formally investigated,
17   he elected not to run for re-election.  He can't run for judge
18   again.  He agreed not to run for judge again.
19            (Papers shuffling)
20            COURT REPORTER:  I'm sorry.  I can't hear you.
21            THE WITNESS:  Do I need to --
22            THE COURT:  Yeah, why don't you sit back down.
23            So you testified that he was removed from the bench.
24   But that's not true, is it?
25            THE WITNESS:  Well, he was forced off the bench.  He
```

1  was forced --
2          THE COURT:  Did he serve out his term?
3          THE WITNESS:  He served out his term, and he agreed
4  not to run for re-election or run for judge again.
5          THE COURT:  That's a little different, isn't it, than
6  someone being removed from the bench?
7          THE WITNESS:  Well, yeah, you're right.  I misspoke.
8  I mischaracterized that, not intentionally.  But he did --
9          THE COURT:  What's not intentionally?
10         THE WITNESS:  I didn't intentionally mean to say that
11 he was actually, like, removed from the bench.  I meant he was
12 removed because he could not run for judge again, and he can't
13 run for judge again.
14         THE COURT:  You know, you play semantics with words,
15 but words matter.  He wasn't --
16         THE WITNESS:  I agree.
17         THE COURT:  Just like you did about the whole arrest
18 where you tried to say you weren't arrested when you were.  He
19 was not removed from the bench, which is what you just told
20 the jury.  He did not run for re-election, and maybe there was
21 an agreement with the JQC that he would not run for
22 re-election, but that's totally different than someone being
23 removed from the bench.  So, yeah, I don't know what to do
24 with that.  I suspected what you were saying wasn't true
25 because I keep up with those things, and I wasn't aware of the

```
 1   JQC removing a judge from Henry County.
 2              THE WITNESS:  But you're correct, Judge.  You're
 3   right, Judge Ray.  He agreed not to run for re-election and
 4   agreed not to run for judgeship again.  I don't know if for
 5   office or judgeship.
 6              THE COURT:  You seem to have a very cavalier affinity
 7   for being completely correct with what you say in court, so I
 8   don't know what to do with that.  But I suspected that that
 9   wasn't true, and it wasn't true.  So I will ponder that.
10              THE WITNESS:  Okay.
11              THE COURT:  Thank you.
12                         -  -  -
13              (Proceedings continued.)
14                         -  -  -
15              THE COURT:  All right.  Ms. Lewis, would you come
16   back up here and have a seat, please.
17              THE WITNESS:  Yes, sir.
18              THE COURT:  I need to understand your -- the
19   testimony I've heard when the jury was here before we took the
20   break about Judge Harper, you said that because of his dispute
21   with you and the things that he did -- and, by the way, the
22   transcript is going to reflect what you said, but I'm just
23   paraphrasing it -- was that he was removed from the bench.
24   And then I asked you, once the jury was removed from the
25   courtroom to go on a break, was that true because I was not
```

1  aware of a state court judge in Henry County being removed
2  from the bench. And you said, well, no, he agreed not to run
3  for -- he retired and agreed not to run for re-election --
4          THE WITNESS: That's right.
5          THE COURT: -- because of that dispute. Do you stand
6  by what you told me in court a few minutes ago?
7          THE WITNESS: Your Honor --
8          THE COURT: Yes or no?
9          THE WITNESS: Which part? That he was removed?
10         THE COURT: That he was -- well, you've already
11 backed away from that. I'm talking about that he agreed,
12 because of the dispute with you, not to run for re-election
13 presumably with the JQC.
14         THE WITNESS: Well, I cannot say specifically that he
15 agreed not to run for re-election specifically because of me.
16         THE COURT: But you did imply, if not state that, in
17 response to my questioning you about your statement that he
18 was removed from the bench.
19         THE WITNESS: He was not removed from the bench, your
20 Honor. I can tell you what the investigator told me.
21         THE COURT: The investigator for the JQC?
22         THE WITNESS: Yes, sir.
23         THE COURT: So let me just tell you I just contacted
24 the JQC and talked to a gentlemen who is one of the -- been
25 involved in the JQC since 2002. He wasn't aware of

```
 1  Mr. Harper, of a case involving Mr. Harper being removed.  And
 2  he also told me that the JQC of Georgia has never made an
 3  agreement with any judge for them to serve out their term and
 4  not run for re-election.
 5          THE WITNESS:  I can only go on what was said to me,
 6  your Honor.
 7          THE COURT:  Who was the investigator?
 8          THE WITNESS:  Her first name was Elaine.
 9          THE COURT:  Elaine.
10          THE WITNESS:  And this is what she told me.  She told
11  me that she had gone to talk with Judge Harper and that --
12  then I received a letter in the mail saying something about
13  that the case was being closed for -- I don't know if it said
14  insufficient evidence or something, but she told me to keep my
15  ears open for -- I'll hear something in the next couple of
16  weeks.  And within the next couple of weeks, Judge Harper
17  announced in the bar, in the bar association meeting, that he
18  was not going to seek re-election.
19          THE COURT:  So you took what she said, keep your ears
20  open, and then when he announced that he was not running for
21  re-election and he was retiring, to mean that he had an
22  agreement with the JQC that he would not run for re-election?
23          THE WITNESS:  That's what I heard.
24          THE COURT:  You heard it from who?
25          THE WITNESS:  I don't recall who told me that, but it
```

1  was not from Elaine.
2           THE COURT:  Okay.
3           THE WITNESS:  It was so long ago.
4           THE COURT:  Well, I've got serious concerns about a
5  lawyer coming in court, a lawyer whether they're a witness or
6  not, and providing testimony that is untruthful.  And part of
7  the obligation I have to the state bar is to let them know
8  that, and I intend to do that.  I intend, when this case is
9  over with, to contact the state bar, to provide them a copy of
10 the transcript from this afternoon where you discussed Judge
11 Harper and where you discussed it with me so that they can
12 begin an investigation with regard to whether you have
13 violated the rules of professionalism and ethics of an
14 attorney.
15          We trade on the truth, and when people don't tell us
16 the truth -- and we understand that we don't always hear the
17 truth -- you know, it makes it difficult to figure out what
18 justice is.  That is particularly a problem when the person
19 that is telling us things that aren't true is an attorney
20 who's licensed by the state.  So, in any event, I'm just
21 letting you know that that's what I'm going to do.
22          I mean, it may be very well that the defendants want
23 to even cross-examine you about what you said because right
24 now all the jury knows is what you've said, but they may very
25 well just leave that as it is.  But I'm not leaving it as it

```
 1  is.  I'm letting the state bar investigators know what's
 2  happened in this court today.  You can step down, ma'am.
 3              THE WITNESS:  Your Honor, may I say something?
 4              THE COURT:  Yes, ma'am.
 5              THE WITNESS:  I did not -- I really mischaracterized
 6  using that word "removed," and it did imply that he was
 7  removed from the bench and that he was removed as a result of
 8  a JQC complaint that I filed against him.  And that is not
 9  true, and that is not what I intended to be, you know, to
10  imply.  And so I apologize for that.
11              THE COURT:  You're going to have to take that up with
12  the bar.  Thank you.  All right.  So we'll see y'all Monday
13  morning at 9:00 o'clock.  Okay.  All right.
14
15
16
17
18
19
20
21
22
23
24
25
```